ANNA K. WRIGHT, Executrix, *v.* CARROLL H. REVER, Administrator.

*Lost Document—Assignment of Insurance Policy—Evidence as to Existence.*

In proving the contents of a missing document, verbal precision cannot be insisted on, and the substance of the material facts only need be proved.                    pp. 565, 566

On an issue between the personal representatives of two brothers, as to whether a policy of insurance on the life of one had been assigned by him to the other, *held* that the testimony of witnesses that they had seen the assignment, together with other evidence showing the probability of its having been made, called for a reversal of the chancellor's finding that there was no such assignment.                    pp. 565, 569

The sufficiency of the search for a missing document, in order to justify the admission of secondary evidence of its contents, is largely in the discretion of the trial court.          p. 570

*Decided December 3rd, 1926.*

Appeal from the Circuit Court No. 2 of Baltimore City (STANTON, J.).

Bill of interpleader by the Eureka-Maryland Assurance Corporation against Anna K. Wright and another, executrices of Robert J. Kearney, deceased, and Carroll H. Rever,

administrator of James Kearney, deceased. From a decree awarding the fund in dispute to said Rever, said Anna K. Wright, as surviving executrix, appeals. Reversed.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, and PARKE, JJ.

*E. Paul Mason*, with whom was *Robert J. MacGregor* on the brief, for the appellant.

*A. Bernard Chanceller* and *Walter C. Mylander*, with whom was *C. M. Armstrong* on the brief, for the appellee.

ADKINS, J., delivered the opinion of the Court.

This case grows out of a dispute between executrices of Robert J. Kearney and the administrator of James Kearney as to which estate was entitled as beneficiary of policy No. 736, for $10,000, in the Maryland Assurance Corporation, on the life of the said James Kearney, and dated July 8th, 1919.

The Eureka-Maryland Assurance Corporation, which has taken over the business of the Maryland Assurance Corporation, filed a bill of interpleader. A decree requiring the parties to interplead was passed, and the case was heard with Anna K. Wright and Jennie K. Greenfield, executrices of Robert J. Kearney, as plaintiffs, and Carroll H. Rever, administrator of the estate of James Kearney, as defendant. Pending the trial Mrs. Greenfield died, and the case proceeded with the surviving executrix as plaintiff.

In the policy Robert J. Kearney was named as beneficiary, but the policy provided that the insured should have the right to change the beneficiary at any time during the continuance of the policy, subject to the written consent of the assignee, if any, and that, if no beneficiary should survive the insured, the amount under the policy should be payable to the insured's executors, administrators, or assigns.

On January 19th, 1920, all the right, title and interest in this policy, and in a policy in the Provident Life & Trust Company, and in one in the Sun Life Insurance Company of Canada, was assigned by Robert J. Kearney to the Hamil-

ton Bank. In November, 1921, the bank notified the insurance company by letter that it held said policy No. 736, under an assignment from Mr. Robert J. Kearney of his beneficial interest therein, in response to which notice the bank was advised that the insured should join in the assignment and the company should have a record of the assignment. A proper form was furnished and, on November 17th, 1921, a joint assignment to the bank was executed by James Kearney and Robert J. Kearney, a duplicate of which was filed with the company on January 18th, 1922.

During the life of Robert J. Kearney he paid all the premiums on this policy. When he paid the premium due July 8th, 1922, he advised the company that James J. Kearney was in poor health, and requested the waiver of the payment of the premium under the disability clause of the policy, and there was some correspondence about it, but it was not arranged.

Robert J. Kearney died December 18th, 1922. When the next premium came due, notice was sent to the R. J. Kearney Co.'s office, and Mrs. Anna K. Wright, one of the executrices of Robert J. Kearney, being under the impression that there had been a waiver of premiums, inquired why the notice had been sent. The matter was explained to her and the check, signed by Anna K. Wright and Jennie K. Greenfield (Mrs. Greenfield being the other executrix) for this premium, was sent to the company. In a letter replying to Mrs. Wright's inquiry as to why the notice was sent, after an explanation of the notice, Charles F. Stein, the then actuary of the company, says: "We may say, however, in passing, that the policy was originally made payable to Mr. Robert J. Kearney, brother of the assured, and notwithstanding the fact that Mr. Robert J. Kearney has since passed away, the beneficial interest under the policy has not been changed, though the policy itself has been assigned to the Hamilton Bank, as security, we presume, for a loan obtained from that bank." The testimony shows that the company was not notified of an assignment claimed to have been made by James to Robert.

After paying the premium above mentioned, Mrs. Wright, who was the active executrix, took up with the company the matter of the waiver of premiums, had the necessary blanks filled out, and received back the premium paid by her and her co-executrix, giving a receipt for it dated October 2nd, 1923, signed Anna K. Wright, executrix. The policy was withdrawn at this time temporarily from the Hamilton Bank in order that the waiver might be endorsed on it by the company. Mrs. Wright testifies that while the policy was in her possession at this time, she saw attached to it an assignment of it by James Kearney to Robert J. Kearney. She had previously talked with Robert Kearney, "when he had this assignment put on the policy."

On April 22nd, 1924, the executrices paid the bank the balance of the note of Robert J. Kearney ($7,528.75) and the policy was delivered to them. On April 23rd, 1924, Charles P. Burger, cashier of the Hamilton Bank, wrote the company: "The claims of the Hamilton Bank to the right, title and interest to the above mentioned policy having been satisfied, the Hamilton Bank relinquishes all claims to said right, title and interest, hereby reassigning all right, title and interest in the policy to James Kearney and Anna K. Wright and Jennie K. Greenfield, executrices of the estate of Robert J. Kearney, as their respective interests may appear. If you have a form for the purpose of releasing claims instead of the above letter, we will execute such further papers as are necessary to establish the sole right of the Kearney estate to the proceeds of the policy."

In response to this letter the company sent the bank the company's form of release, which was executed by the bank in duplicate, and both copies returned to the company with the request that the company send one copy to Mrs. Wright to be attached to the policy which was in her possession. Robert J. MacGregor, a witness for appellant, was counsel for the executrices of Robert J. Kearney. He testified on cross-examination that he did not see the policy before it was assigned by the bank, but he advised Mrs. Wright to pay the amount due the bank on Robert J. Kearney's note "because

Mrs. Wright told me that there was an assignment on these of all James' rights to Bob and I said, 'if that assignment is on there you have a perfect right to pay the money.'" Testifying in chief this witness said that, after the policy was assigned and came into Mrs. Wright's possession, the executrices were uncertain as to whether the form of assignment from the Hamilton Bank protected the estate, and consulted witness about the matter. It was in this connection that the policy was first seen by him. When he received the policy there was, with the other assignments, one attached to it from James to Robert. Witness went to the company's office to confer with them about the assignment from the bank and saw there Mr. Zimmerman, who was connected with the office and showed him the policy with the papers attached to it. Witness seems to have been reassured and reported to Mrs. Wright orally. Subsequently he wrote her a letter (the contents of which were not admitted in evidence) returning the policy. Mr. and Mrs. Wright and Mrs. Greenfield all testify that they saw the assignment from James to Robert attached to the policy a short time after it was returned by MacGregor.

Mrs. Wright and her husband testified that, a few days before the death of James Kearney and when his death seemed imminent, Mrs. Wright took this policy with others out of a safe in their house where they were kept, and was looking over the policies with her husband. He read the policy in question and noticed its provisions, and differed with her as to the effect of them. It was during this discussion that she showed him the assignment from James to Robert. Mrs. Wright described the paper on which this assignment was written as being yellow and smaller in size than the other assignments. She said as far as she could remember, after reading it quite a good many times, it said, "I, James Kearney for my heirs and assigns, assign all right, title and interest to the policy to Robert J. Kearney, his heirs and assigns."

Mr. Wright said: "As near as I recollect, the assignment read something like 'In consideration'—some word about consideration—'all my right, title and interest,' or something of

the sort, were assigned to Robert J. Kearney. I can very distinctly remember the signature, because I believe I remarked at the time it looked like it had been written with a match stick. Mr. Kearney wrote very thick. As near as I can remember, it was a general assignment from James to Robert Kearney." As near as he could remember the paper was about two-thirds the size of the assignment from the Hamilton Bank to James and Robert Kearney. The witness said it was his discussion with Mrs. Wright at the time of the examination of this policy that fixed the fact of the assignment from James to Robert in his mind.

Mrs. Greenfield said: "The paper read, as far as I can remember, 'For one dollar, I and my heirs and assigns assign to Robert J. Kearney and his heirs and assigns all rights to this policy.' Of course I don't just know the words, I had no reason to remember word for word, I was just curious to see an assignment and when it came home I said, 'Let me see what an assignment looks like.' I never saw one before and I read it, but that is the only reason I read it." "Mrs. Wright and all of us talked over the policy when it came back, we just did not like the way it read."

MacGregor described the assignment as follows: "My recollection now is that it was a very similar assignment to the others from the Maryland Assurance Company to the Hamilton Bank and from Robert and James Kearney to the Hamilton Bank. I do not think it was long, but the way I explained that length proposition is this, * * * This policy had been handled a great deal and some of them papers in that policy had been folded, and I would say that this assignment had been folded partially and therefore did not look as long as a regular assignment." He said the color of the paper was white, and he does not understand how Mrs. Wright got the idea it was yellow.

As against the direct and positive testimony of these witnesses, who say they saw the assignment, the defendant offers no witness who is able to say there was no such assignment attached to the policy while it was in the possession of the Hamilton Bank, or when it was received by Mrs. Wright

from the bank and while it remained in her possession, or when it was delivered to the insurance company by Mr. Wright, or at any time pending the submission of required proofs by the executors of Robert J. Kearney.

After the proofs were in, Dr. Plummer, who had charge of the claim department, took up the case as a matter of routine, and seeing the assignment from the Hamilton Bank, "and the condition as to who the amount of the policy should be paid to," he thought there was a legal question, and he turned the policy over to Mr. New, the company's legal adviser. When asked "Are you positive you have never seen an assignment from James to Robert Kearney?" he answered, "Yes, Sir, I am positive of that, I have never seen it personally." But it is apparent from his whole testimony that the policy had been in the company's office nearly three weeks before any such examination was made as would have revealed any assignments that might have been attached, and the witness does not recall that even then he saw the assignment from Robert J. and James Kearney to the Hamilton Bank, about which assignment there is no dispute.

Mr. New testifies that when the policy was turned over to him, he examined it and, on April 16th, 1925, wrote Mrs. Wright that, as Robert J. Kearney did not survive the insured, he had advised the company it could not make payment to the executors of Robert J. Kearney, but the company was willing to pay the administrator of James Kearney. In response to this letter MacGregor went to see New, and told him there was an assignment from James to Robert on the policy at the time it was delivered to the company. New testifies that, in response to that statement, he made an investigation at the company's office, by interviewing everybody whose hands it could have gotten into, as to whether they had ever seen the assignment, and they said they had not; that Mr. and Mrs. Wright also told him this assignment was on the policy; New further testified that the assignment was not on the policy when he examined it,

but he also said he did not remember seeing the assignment to the Hamilton Bank attached to the policy. "It may have been, but I don't remember, I haven't any recollection of it."

The learned chancellor held that plaintiffs had failed to establish by clear and convincing proof that an assignment of the policy by James to Robert was ever made and executed, and decreed that the amount of the policy which had been paid into court by the insurance company, less a fee allowed its solicitor and costs of the suit, be paid to the administrator of the estate of James Kearney. From that decree this appeal was taken.

It is not contended by appellee that notice to the company of an assignment of the policy was necessary to the validity of the assignment. As was said in *New York Life Ins. Co. v. Flack*, 3 Md. 341, the provision in that policy in regard to notice of an assignment "was evidently inserted for the protection of the company. Knowledge of the assignment could only be important to it in one view: to prevent the possibility of its being compelled to pay both the assignee and the legal representatives of the insured." See also *Robinson v. Cator*, 78 Md. 72. But it is the claim of plaintiffs that there was in fact a written assignment of the policy that is challenged in this case.

The conclusion of the chancellor and the argument of defendant are based, mainly, on:

(1) Lack of definiteness in testimony offered by plaintiffs to establish the written assignment of the policy in question.

(2) Inconsistency in the testimony of the several witnesses, who claim to have seen the assignment, in description of the paper.

(3) Failure of plaintiffs to produce officers of the Hamilton Bank and Zimmerman in support of their claim.

(4) Circumstantial evidence inconsistent with the existence of a written assignment of the policy at the times plaintiffs' witnesses claim to have seen it.

Taking these in order:

(1) While the testimony of none of the witnesses give all the contents of the missing documents, nor its exact language,

we think testimony as a whole measures up to the requirements laid down in *Robinson v. Singerly Pulp Co.,* 110 Md. 382, where it is said: "It is only necessary to prove the substance of the material facts," and that "verbal precision cannot be insisted upon, as such a rule would practically exclude parol proof." The witnesses could not give the date of the assignment nor its terms in detail, but what they remembered of it was enough to prove that, if their memory was accurate, the paper about which they testified was a valid assignment of the policy.

(2) The only important differences in the testimony of the witnesses was that Mrs. Wright differed from the others in her recollection of the color and size of the paper on which the assignment was written, and one or two of them thought there was a notary's certificate.

(3) The failure of plaintiffs to summon the officers of the Hamilton Bank as witnesses is readily accounted for when their testimony as witnesses for defendants is considered. They simply did not remember whether or not an assignment from James to Robert was attached to the policy while it was in possession of the bank. The cashier of the bank, who was the only officer who was in close touch with the matter of the loan, said such an assignment might have been attached to the policy, but he does not remember whether it was or not. This testimony rather strengthens plaintiffs' claim, coming from witnesses for the defendant, but was not of a character to have been material if offered by plaintiffs. The failure to summon Zimmerman is open to the same inference against defendant as against plaintiff.

(4) The circumstances supposed to have militated against the existence of the assignment are:

(a) Absence of any record of such assignment at the office of the company, and failure of the parties to report the assignment to the company in accordance with the provision of the policy, although their attention was called to said provision; while assignments of policies in another company taken out in the course of the next year or two were duly reported. This is a fair argument and should be duly weighed

in connection with other facts and circumstances. But in
this connection, as showing a tendency to neglect such de-
tails, it is worthy of note that the assignment to the bank
was not reported to the company until nearly two years after
it was made, and a duplicate was not filed with the company
until two years, lacking two days, after said assignment.

(b) Want of recollection of such an assignment by any
officer of the bank or of the insurance company. We have
commented above on the testimony of the cashier of the bank.
Of course the fact that Dr. Plummer did not see the alleged
assignment when he examined the policy is one of the diffi-
culties in the case. But it is not impossible that it was lost
or mislaid before the policy was turned over to the company,
or during the two or three weeks it was in its possession be-
fore the examination by Dr. Plummer.

There are two other criticisms which, after a careful ex-
amination of the record, we do not think are justified:

(1) The alleged failure of Mrs. Wright to notice the as-
signment when she first had the policy in her possession in
the fall of 1923. Mrs. Wright testifies she did notice it at
that time.

(2) The alleged failure of MacGregor, when the policy
was in his possession in May or June, 1924, to take any ac-
tion "to bring to the attention of the insurance company this
alleged assignment from James to Robert," or "to make any
record by letter or otherwise that any such paper was in ex-
istence."

MacGregor's testimony as to his interview with Zimmer-
man has already been referred to. He explained to the court
that when he saw the assignment from James to Robert at-
tached to the policy, "I felt warranted, as I did with the
other assignments, that they were a matter of record." That
Zimmerman told him that "so far as he could see the assign-
ment from James to Robert"—here he was stopped by the
court. On June 26th, 1924, he wrote Mrs. Wright "En-
closed find policy which you gave me of the Maryland Assur-
ance Co., which I advised you the company said was O. K."
This letter was excluded by the chancellor. There was also

some conflict of testimony as between Mrs. Wright and several members of James Kearney's family as to conversations between them, but nothing having any material bearing on the question at issue.

Further, the point is made that that where the credibility of witnesses is involved, the judgment of the chancellor who saw and heard them should have much weight. That is a very proper observation and we have not overlooked it. But the learned chancellor, whose painstaking care in the conduct of this case is apparent, does not base his conclusion on the character of the witnesses or on any lack of good faith in their testimony. He thinks plaintiff's witnesses were mistaken in regard to the alleged assignment from James to Robert, but attributes that mistake to a confusion due to the handling of a number of policies on which there were assignments. As to that we have the same testimony in the record as that on which he passed, and are in an equally favorable position in regard to it. We cannot agree with him that plaintiff's witnesses, who testified that they saw an assignment from James to Robert, were mistaken. The circumstances under which they claim to have seen it are such, in our opinion, as to render this view untenable. Either they saw it or they testified falsely. It comes therefore to this: Are we justified in discarding the testimony of these four witnesses on the record in this case? We would hesitate to do so if there were nothing more than we have already stated. But there is much more. In our opinion the circumstances that tend to support their testimony are much stronger than are those which seem to reflect unfavorably upon it. And most important is the conduct of every one having any connection with the policy, including James Kearney and his family, Robert Kearney, the bank, and the insurance company.

There can be no doubt that the policy was taken out for the benefit of Robert Kearney. The application stated that there was to be no right to change the beneficiary. By some mistake the policy provided that there might be a change of beneficiary. This right however was not exercised by James.

Shortly after the policy was delivered, we find it in the possession of Robert and him using it as collateral for a loan, assigning it without the joinder of James. Subsequently the bank secured another assignment by them jointly. But the attorney and one of the officers of the insurance company testified that it was the practice of the company to require the insured to join in an assignment of a policy as collateral even where it had been previously assigned.

It does not appear from the evidence that James ever took the slightest interest in the policy. On the contrary, on December 10th, 1921, James, in a letter to Mrs. Wright, stated that Robert had about $35,000 on his (James') life, which included the policy in question. It might be, and was, argued that at the time this letter was written Robert was still alive and James expected him to be the survivor. But even after Robert's death in December, 1922, at no time did James make any inquiry at the bank about this policy, although he survived Robert more than two years. Nor did he speak of it either to Robert's executrices, nor to any member of his immediate family, so far as the record discloses, although he did discuss other policies with them which were for the benefit of his estate and his wife. These consisted of two policies in the National Life Insurance Company of Vermont, dated respectively February 13th, 1920, and February 27th, 1920, amounting to $5,000, payable to his wife as beneficiary, and two in the Mutual Life of New York for $5,000 each, dated respectively September 25th, 1920, and October 2nd, 1920, payable originally to his estate, but in which his wife was substituted as beneficiary on March 12th, 1925, a few days before his death. It is significant that this change followed the signing by him of a paper designated as "Last requests of James Kearney, Sr.," in which he requests that "all my insurance be made payable to my wife." If he had considered the policy in controversy as subject to his disposal, why was the wife not made beneficiary in that, when the substitution was made in the others?

From the conduct of the cashier of the bank and of Dr. Plummer in charge of the claim department of the insurance

company, in their correspondence and dealings with Mrs. Wright, there is at least a suggestion that they must have gotten from somewhere, at some time, the impression that Robert had an interest in the policy not dependent upon his surviving the insured. And this they could not have gotten from the provisions of the policy itself, because by those provisions it was perfectly plain that the interest was dependent upon such survivorship. And finally, we come to the testimony of Walter Gillian, the agent, through whom the policy was taken out. This witness discovered the mistake in the policy, above referred to, after it was delivered. He discussed it with both Robert and James, and they asked how it could be corrected. "I told them they could correct that by applying to the court or they could take care of it through an absolute assignment of all interests to Robert J. Kearney." Subsequently, in January, 1920, James told witness the assignment had been made. On a later occasion, after Robert's death, witness saw James on a train going to Washington. James told him he was on his way to Washington at that time to see about the disposal of the machinery of the Robert J. Kearney Company. He again told witness that the assignment had been made to Robert, that all of Robert's interests were protected.

Objection is urged to the admissibility of the proof of the assignment offered by plaintiff, on the ground of insufficiency of evidence that search had been made for the original. But both Mrs. Wright, in whose custody it is alleged to have been until the policy was delivered to the insurance company, and Mr. New, the attorney for the company, testified that search was made for it before the trial. After all, much must be left to the discretion of the trial judge as to the sufficiency of the search. *Robinson v. Singerly Pulp Co., supra; Wigmore on Evidence,* vol. 2, sec. 1194.

> *Decree reversed and cause remanded, that a decree may be passed in accordance with this opinion, with costs to appellant.*